[Cite as *State v. Johnson*, 2016-Ohio-1394.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

Appellee

v.

Jonathon Johnson

Appellant

Court of Appeals No. L-13-1267

Trial Court No. CR0201301534

**DECISION AND JUDGMENT**

Decided: March 31, 2016

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
David F. Cooper, Assistant Prosecuting Attorney, for appellee.

Douglas A. Wilkins, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal brought by appellant, Jonathon Johnson, from the judgment

of the Lucas County Common Pleas Court which found him guilty of carrying concealed

weapon; murder with a firearm specification; aggravated robbery with a firearm

specification and felonious assault with a firearm specification.

{¶ 2} Appellant presents a singular assignment of error in his original merit brief and argues that "the evidence was insufficient to support appellant's conviction and the conviction was against the manifest weight of the evidence."

{¶ 3} In *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), the Ohio Supreme Court outlined the analysis required to determine the sufficiency of the evidence:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia* [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.) *Id.* at paragraph two of the syllabus.

{¶ 4} Appellant challenges all of his convictions on sufficiency of the evidence grounds.

{¶ 5} With this standard in mind, we will now examine each of the convictions to determine whether the verdicts were supported by sufficient evidence. Appellant argues that there was conflicting and suspect testimony concerning the events of the early

2.

morning hours of October 5, 2012. Specifically, he contends that the eyewitnesses who testified each had their own credibility concerns.

{¶ 6} The first eyewitness was Joy Goetz, sister of another eyewitness, Andrew Goetz (Hot Boy). She testified that she was babysitting Fredlisha (Alisha) Hughes' son that night at her home. At the Goetz house that night were Chaz Jackson, Alisha Hughes and appellant. They were drinking gin. Around midnight, Alisha gave them a ride to the Bottom Line Bar. At around 2:00 a.m., Goetz called Joy and asked her to deliver pills to the bar. Later, Goetz, appellant, Chaz and Alisha returned to the residence. Joy noticed there was another "dude with the ponytail."

{¶ 7} Joy drove Goetz, Chaz and appellant to the Ravine Park Village. Upon arriving at the apartment complex, appellant, Chaz and Goetz left the car. Joy remained in the vehicle. After about one-half hour, she heard gunshots. Four or five gunshots. She saw appellant with a handgun running back to the car. Joy told appellant that she would not allow him into the car with the gun and locked the doors. Appellant fled on foot. Chaz and Goetz got into the car, but the car would not start. They also ultimately fled on foot.

{¶ 8} Goetz testified that he had sold some Percocet pills in the parking lot of the Bottom Line Bar. He believed that a person called "JJ" whose real name was Jonathon Morris, watched the transaction. Later, a fight erupted in the bar. Afterwards, Goetz, appellant, Chaz, Kamal and Alisha went back to Goetz's house. Shortly thereafter, Goetz discovered that the powder cocaine that he had in his pocket was missing. Goetz

3.

surmised that JJ must have gone into his pocket during the fight at the bar and picked his pockets. He was intent on getting it back. He, appellant and Chaz had Joy give them a ride to the Ravine Park Village apartment complex where they believed that JJ lived. Upon arrival, Goetz confronted JJ and struck him in the face with the gun and knocked him down. The gun fell out of his hand. Goetz tussled with JJ on the ground momentarily. Chaz removed JJ's pants. When Chaz got JJ's pants off, the group began to run away. Then appellant came back and shot JJ. Someone came out of an apartment and appellant fired several shots toward the person but these shots missed and struck the house.

{¶ 9} Alisha testified that she saw appellant with a handgun while at the Goetz residence. In fact, she saw it fall out of the waistband of his pants and onto the floor. She told him to "quit playing."

{¶ 10} Chaz testified that he had seen appellant with a revolver on October 4, the day before the homicide. He stated that he carried it on his hip. Also, in the early morning hours of October 5, when the group went to the Ravine Park Village to encounter JJ, Chaz saw appellant with a handgun. He further testified that he saw appellant give Goetz the gun. After appellant pistol-whipped JJ and the gun fell to the ground, Chaz picked it up and put it into his back pocket. Chaz removed JJ's pants and found only drugs in the pocket. He discarded the pants in a nearby dumpster. He saw appellant standing over JJ on the ground and shoot him.

4.

{¶ 11} Appellant's only witness, Gabriela Gonzalez, stated that she witnessed Goetz pulling the pants off the victim JJ and also heard Goetz yell to Chaz "pick up the gun, shoot him if you got to. Pick it up, shoot him." She also testified that she saw Chaz pick up the gun from the pavement and that he was so drunk that "when he picked it up so sloppily that it shot off" and the shot hit the ground. She left the area after that shot was fired and went to another person's house when she heard "between three and four shots." She did not witness JJ being shot.

{¶ 12} Toledo police were dispatched to the Ravine Park Village. The responding crew saw a person, later identified as appellant, walking away from the area of the Village. A foot chase ensued with appellant eventually being apprehended. Upon booking into the jail, appellant was observed trying to discard ten .22 caliber bullets into a trash can.

{¶ 13} A gun was never found but the police did have possession of the revolver that Chaz picked up the night of the homicide. A scientific expert from BCI conducted a DNA analysis and concluded that appellant's DNA was on the pistol grip that witnesses said separated from the gun and fell on the pavement after the victim was pistol-whipped.

{¶ 14} Detective Peter Siwa was summoned to the scene. His testimony was that he arrived at the scene approximately twenty minutes after the shooting was reported.

{¶ 15} Approximately five minutes after he arrived at the scene, a woman with a cell phone in her hand approached Detective Siwa. She asked that the detective speak

5.

with the victim's mother.  This person then made a statement to the effect that she heard somebody say "go into his pockets; if you have to shoot him then shoot him."

{¶ 16} It is this statement that appellant now argues should have been admitted. Appellant argues that this statement should have been admitted as an exception to the hearsay rule under Evid.R. 803, an excited utterance.

{¶ 17} Decisions regarding the admission of evidence are within the sound discretion of the trial court and may not be reversed absent an abuse of discretion. *Proctor v. NJR Properties, L.L.C.*, 175 Ohio App.3d 378, 2008-Ohio-745, 887 N.E.2d 376, ¶ 14, citing *O'Brien v. Angley*, 63 Ohio St.2d 159, 163, 407 N.E.2d 490 (1980).  An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.  *NJR Properties, supra*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 18} An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Evid.R. 803(2).  A four-part test is applied to determine the admissibility of statements as an excited utterance:

> (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement of declaration spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

(c) that the statement or declaration related to such startling occurrence or the circumstances of such starling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration. *State v. Taylor*, 66 Ohio St.3d 295, 612 N.E.2d 316 (1993).

{¶ 19} The trial court herein found that the witness's statement was concerning the startling event; namely, the shooting. The court further found that the statement was related to the startling event and the witness had an opportunity to actually hear the other person's statements concerning the shooting. Nevertheless, the court found that there was an intervening event of the telephone call from the victim's mother which could have enabled some reflective thought and thereby removing the statement from being considered an excited utterance. In this context, we are unable to conclude that the decision of the trial court was an abuse of discretion and therefore find this argument not well-taken.

7.

{¶ 20} Appellant further argues that there were significant inconsistencies in the testimony of the witnesses that would link the gun used in the killing to appellant. However, any inconsistencies between what Goetz, Chaz and Joy told the police and what they testified to at trial were subject to cross-examination at trial. At trial, each of these witnesses testified that appellant had the gun in his hand at the crime scene. Goetz and Chaz said that they witnessed appellant shoot the victim. Although the police never found the gun used in the shooting, a wooden pistol grip was found on the pavement. Witnesses testified that Goetz had gotten the gun from appellant and then Goetz pistol-whipped the victim and the gun flew out of his hand. When it hit the pavement, the wooden pistol grip came off. The gun was then picked up by Chaz and appellant retrieved it from Chaz's back pocket. Appellant's DNA was found on the pistol grip. Since the relevant inquiry under a sufficiency of the evidence standard does not include interpretation of evidence or determination of credibility of witnesses by the appellate court, appellant's argument in this respect is found not well-taken.

{¶ 21} Finally, appellant also argues that the conviction of felonious assault "was not supported by the evidence on the record."

{¶ 22} However, both Goetz and Chaz testified that after appellant shot the victim, he shot at a person as he came out of his house. Surveillance video also established that appellant was firing his gun at someone walking out of an apartment. Appellant argues that the victim, Christopher Solis, died in a car accident before trial and the jury never

8.

heard from any other witnesses other than Goetz and Chaz, who were also charged with felonious assault of the same victim. However, R.C. 2903.11(A)(2) states:

(A) No person shall knowingly do either of the following:

(1) Cause serious physical harm to another or to another's unborn;

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

{¶ 23} Thus, the identity of the victim is not an element of the statute. Given the eyewitness accounts of the co-defendants, as well as the surveillance videos, we find that there was sufficient evidence to establish each of the elements of felonious assault.

{¶ 24} We have examined the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. After viewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. We cannot find that these convictions were against the sufficiency of the evidence.

{¶ 25} Appellant also asserts that his convictions were contrary to the manifest weight of the evidence. When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully "examine the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses, and determine whether the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial

9.

ordered.'" *State v. Tibbetts*, 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Having undertaken this examination, we are unable to conclude that the jury clearly lost its way. Therefore, we find that the trial court's conviction is not against the manifest weight of the evidence. Accordingly, appellant's second argument under his sole assignment of error is not well-taken.

{¶ 26} In his supplemental brief appellant has presented one additional assignment of error for consideration by this court. He argues that the trial court "committed reversible error in failing to order a new trial."

{¶ 27} More specifically, he contends that exculpatory evidence was withheld by the state and had that evidence been introduced, the evidence would have changed the verdict. Appellant specifically references seven telephone calls as having not been disclosed prior to the trial.

{¶ 28} We will address the seven individual undisclosed telephone calls separately.

{¶ 29} The first telephone call originated from a Crime Stopper call wherein the caller stated that an individual named "Chico" was threatening people and that the caller overheard people saying that this would be the second time "Chico" had shot someone. The caller also identified Casandra Cherry as a person of interest. This caller was anonymous. Appellant has not articulated how this statement would lead to potentially

10.

exculpatory evidence. The evidence at trial established appellant at the scene with DNA evidence on the handle of the grip of a revolver left on the pavement.

{¶ 30} The second call at issue was a call from a person identified as "Sonya" claiming a car containing three people stopped outside a house around 5:00 a.m. on the morning of the shooting, and one of the occupants placed something into the bushes outside the yellow house located at or near 24 Clyde. In response, the detectives checked the bushes and found nothing. It is undisputed that the actual weapon used in the killing was never recovered and appellant has offered no argument as to the exculpatory value of this telephone call.

{¶ 31} The third undisclosed call came from an anonymous caller stating that the shooter was "Chaz Jackson" and that "Hot Boy" was involved. Even though this call may not have been admissible, appellant has not presented an argument as to how this call could have led to the discovery of admissible evidence. The evidence established that appellant was at the scene of the crime and an active participant in the confrontation. The state argued that appellant was guilty of at least complicity and the jury was so instructed. As the trial court pointed out, the identity of the shooter under the circumstances of the charge to the jury would not have exculpated appellant.

{¶ 32} The fourth undisclosed telephone call was an anonymous caller who identified the shooter as appellant. This call obviously did not exculpate appellant.

{¶ 33} The fifth undisclosed call was another anonymous Crime Stopper call. The caller was later identified as Melinda Taylor. This call provided a detailed description of

11.

the events of the evening. She later provided a videotaped statement which was made available to defense counsel. She made it clear that her information was second-hand, provided by her son Leon Jackson. Her description of the events that evening was consistent with the witnesses that testified at trial. None of this information could be considered useful for the defense and appellant has not further articulated how this call could lead to anything exculpatory.

{¶ 34} The sixth undisclosed call was yet another anonymous Crime Stopper call. This caller identified "Goetz" as the shooter. Such information was not necessarily inconsistent with the state's theory that Goetz, Jackson and appellant were at least complicit in the murder. The caller did not place appellant at another location or provide him some sort of alibi. This is not necessarily exculpatory for the defendant.

{¶ 35} The seventh undisclosed call was from an anonymous caller that stated that "Jackson" and a woman named "Gabby" were preparing to leave town. This information was of limited, if any, value. Appellant has not presented an argument as to how this call could be useful in providing exculpatory information.

{¶ 36} The Supreme Court has held that suppression by the prosecution of evidence that is favorable to the accused and "material either to guilt or to punishment" is a violation of due process. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

{¶ 37} Evidence suppressed by the prosecution is "material" within the meaning of *Brady* only if there exists a "reasonable probability" that the result of the trial would

12.

have been different had the evidence been disclosed to the defense. *Kyles v. Whitley*, 514 U.S. 419, 433-434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

{¶ 38} As the United States Supreme Court has stressed, "the adjective ['reasonable'] is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles* at 434.

{¶ 39} On the record before us, we find no reasonable probability of a different trial outcome had the defense received any of these previously undisclosed telephone calls. One statement identified appellant as a participant in the murder. And the remaining statements did not exculpate appellant. *See State v. Waddy*, 63 Ohio St.3d 424, 433, 588 N.E.2d 819 (1992) (holding evidence not to be material within the meaning of *Brady* when the evidence did not eliminate the defendant as the perpetrator).

{¶ 40} Appellant's assignments of error are found not well-taken.

{¶ 41} In conclusion, we affirm the judgment of the Lucas County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                              _____
                                                              JUDGE

Thomas J. Osowik, J.

                              _____
James D. Jensen, P.J.                                   JUDGE
CONCUR.

                              _____
                                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.